IN THE FEDERAL DISTRICT COURT OF THE
DISTRICT OF COLUMBIA

**AHMED ALI, MD**
12307 Pleasant Prospect Rd.
Mitchellville, MD 20721                )
                                       )
     **Plaintiff**                )
                                       )
-vs-                                   )
                                       )
**ENVISION HOSPITAL CORPORATION d.b.a.** )
**GREATER SOUTHEAST COMMUNITY**        )
**HOSPITAL OF WASHINGTON**             )
1310 Southern Avenue SE                )
Washington, DC 20032-4623              )
                                       )
**THE DISTRICT OF COLUMBIA (ON**       )   **Case No. 1:08-cv-00431-CKK**
**BEHALF OF ITS HEALTH REGULATION**    )
**AND LICENSING ADMINISTRATION)**      )
441 4th Street NW #1060N               )
Washington, DC 20001                   )
                                       )
**SCOTT C. BURR, M.D.**                )
1310 Southern Avenue SE                )
Washington, DC 20032                   )
                                       )
**WILTON O. NEDD, M.D.**               )
106 Irving Street NW                   )
Washington, DC 20010                   )
                                       )
                                       )
     **Defendants.**             )

RECEIVED

APR 2 4 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ORIGINAL

## AMENDED COMPLAINT AND DEMAND FOR TRIAL BY FOR JURY

**COMES NOW** Plaintiff, Ahmed Ali, M.D., by and through undersigned counsel

bringing this action against the Defendants, Envision Hospital Corporation, d.b.a. Greater

Southeast Community Hospital of Washington, the District of Columbia on behalf of its

Department of Health, Health Regulation and Licensing Administration, Wilton Nedd, M.D., and

Scott Burr, M.D., and pleads as follows:

## I.  <u>NATURE OF THE ACTION</u>

Plaintiff, Ahmed Ali, M.D., brings this action in order to recover damages for (i) violation of 42 U.S.C. § 1983, (ii) negligence, (iii) breach of contract, (iv) promissory estoppel, (v) tortuous interference with contract and current or prospective business advantage, (vi) fraud, (vii) negligent misrepresentation, (viii) intentional infliction of emotional distress, (ix) violation of the District of Columbia Unfair Trade Practices Act and (x) declarative relief, plus pre-judgment interest, costs and attorneys' fees for damages, as well as punitive damages, incurred as a proximate result of the Defendants' cumulative actions.

## II.  <u>PARTIES</u>

1.      Dr. Ahmed Ali, ("Dr. Ali"), is a medical doctor, vascular and transplant surgeon and resident of the State of Maryland, who at all times relevant herein (other than those so-stated) was duly licensed to practice medicine and surgery in the State of Maryland (since 1980) and the District of Columbia ("District") (since 1979). He has been Board-certified by the American Board of Surgery since 1987.

2.      Greater Southeast was until recently a 450-bed general hospital at all times relevant herein owned and operated by Envision Hospital Corporation ("Envision") of Scottsdale, Arizona, a Delaware corporation doing business in the District, under the laws of the District and the United States of America. It has recently been sold but is accredited by the Joint Commission for the Accreditation of Healthcare Organizations ("JCAHO") and is a member of the American Hospital Association ("AHA"). Its physical address is 1310 Southern Avenue SE, Washington, DC 20032-4623 and its

Registered Agent for service of process is CT Corporation System at 1015 15th Street NW, Suite 1000, Washington, DC 20005.

3.    The District of Columbia Department of Health, Health Regulation and Licensing Administration (f/k/a the Health Professional Licensing Administration ("HPLA") is a division of the District of Columbia Department of Health providing services, administration and regulatory oversight through *inter alia* health professional licensing, pharmaceutical control, health regulation, animal disease and food prevention and rodent control.  As it is an agency of the District of Columbia, the District itself is named herein as a Defendant pursuant to District of Columbia Superior Civil Court Rule 4(j)(1).  The physical address of HPLA is 717 14th Street NW, Suite 600, Washington, DC 20005, and 441 4th Street NW #1060N, Washington, DC 20001, for  the District's Attorney General's Office.

4.    Dr. Wilton Nedd is a medical doctor, cardiothoracic surgeon and, by information and belief, a resident of the District of Columbia, who at all times relevant herein, was duly licensed to practice medicine and surgery in the District of Columbia and a chief competitor of Dr Ali, particularly in the subspecialty of vascular and endovascular surgery.  His office address is listed above.

5.    Dr. Scott Burr is a medical doctor, anesthesiologist, and by information and belief, a resident of the District of Columbia, who at all times relevant herein was duly licensed to practice medicine and surgery in the District of Columbia and at all times relevant herein was Chief of Anesthesiology at Greater Southeast.  His office address is listed above.

3

### III.  JURISDICTION & VENUE

6.      This suit is brought and jurisdiction lies pursuant to 28 U.S.C. §§ 1331, 1332 and 1343 and the 14th Amendment to the United States Constitution.  This action seeks damages pursuant to 42 U.S.C. § 1983 and under common law claims subject to this court's supplemental jurisdiction under 28 U.S.C. § 1367.  The amount in controversy exceeds $75,000.00.

7.      This Court has personal jurisdiction over the Defendants whose primary place of business is the District of Columbia.

8.      Venue is proper in this Court because of the location of this Court in relation to where the events in question arose.

9.      The District of Columbia is treated as a municipality for purposes of litigation under 42 U.S.C. § 1983 and may be sued under said statute.  *Best v. District of Columbia,* 743 F.Supp. 44 (D.D.C., 1990).

### IV.  OPERATIVE FACTS

10.     Dr. Ali is a vascular and transplant surgeon having received his medical degree and completed his internship at the University of Cairo, later completing a surgical residency and fellowship in transplant surgery at the Washington Hospital Center and finally receiving postgraduate training in endovascular surgery at the Arizona Heart Institute.

11.     In 2002, Dr. Ali was encouraged by Mr. Singh Taneja and Dr. Maurice McCreary (then Chief of Surgery at Greater Southeast) to open a vascular access center there where he would perform various surgical procedures, including but not limited to graft insertions, vascular access, angioplasty, atherectomy (plaque removal) and

thrombectomy (clot removal). At that time Greater Southeast was being reviewed by JCAHO for suboptimal performance (inconsistent with JCAHO standards) in regard to vascular access surgery. Dr. Ali, based upon his education and experience, was told he could be of assistance to Greater Southeast and its patients in remedying any shortfalls in his area of expertise and was admitted to its medical staff in November 2002.

12.    Prior to accepting the vascular access center opportunity at Greater Southeast, Dr. Ali primarily practiced at the George Washington University Hospital ("GWU"). There, his patients were primarily affluent while his Greater Southeast patient population was primarily economically disadvantaged. Nonetheless, Dr. Ali built a noteworthy and profitable practice at Greater Southeast while providing needed care to many underprivileged persons seeking care there.

13.    By information and belief, Dr. Nedd communicated his dissatisfaction with Dr. Ali's endovascular surgical management as it related to four prior patients (all actually prior patients of Dr. Nedd who had subsequently sought vascular care from Dr. Ali, leaving Dr. Nedd's practice) to members of Greater Southeast's medical staff, subsequently providing a highly critical formal written peer review ("internal review") of said cases and communicating his opinion to various medical staff members.

14.    On or about May 25, 2005, with less than twenty-four (24) hours notice and after Dr. Nedd's internal review had been communicated to them, Dr. Ali attended a meeting attended by several members of Greater Southeast's medical staff, including but not limited to Scott Burr, MD (Chair of the Department of Anesthesiology), G.

Balikssoon, MD (Chair of the Department of Surgery), Dr. Nelson (Ob-Gyn), Dr.

Potter (Chief of Medical Staff) and Cyril Allen, MD (Chief Medical Officer). There,

Dr. Ali was informed that Greater Southeast would enquire as to the four patients

reviewed by Dr. Nedd, who had experienced cerebrovascular accidents (stroke)

("CVA") in the perioperative period.

15.    At the May 25, 2005 meeting, Dr. Ali, having previously attributed the patients'

CVA's to oversedation by the Anesthesia Department, immediately became aware

that the culpability for said adverse events was being wrongfully deflected towards

him, rather than the Anesthesia Department, chiefly through the efforts of Drs. Burr

and Nedd, both obviously interested parties.

16.    After said meeting, Dr. Allen informed Dr. Ali that no formal investigation had

commenced as to his professional conduct in the management of the patients at issue,

such that no report to any reporting and licensing authority, including but not limited

to HPLA and the National Practitioner Data Bank ("NPDB"), would be required and

that strict confidentiality would apply as to the inquiry by the medical staff.

17.    Following said meeting Dr. Ali was telephoned by Dr. Burr, who after representing

that he was acting on behalf of Greater Southeast, informed him that the matter could

be resolved by Dr. Ali's voluntarily surrendering his angioplasty privileges there. Dr.

Burr reiterated that no reports to the NPDB or HPLA would be made as no

investigation had occurred and that the matter would be held in confidentiality, not

made public and subsequently closed. Dr. Ali relied upon said assertions in his

subsequent decision making.

18.     Believing it in the best interests of his patients, concerned as to their safety in the
        hands of the Greater Southeast Department of Anesthesia and understanding that no
        reporting to the NPDB or HPLA would be made, Dr. Ali elected to surrender his
        angioplasty privileges in May of 2005.

19.     On or about June 1, 2005, Greater Southeast, despite the above assertions to Dr. Ali
        and prior to any external review of the cases at issue, summarily suspended his
        surgical privileges, whereby he was unable to provide surgical services of any type to
        his patients at Greater Southeast.

20.     Under the applicable medical staff bylaws, such a summary suspension is reserved
        only for situations in which the involved practitioner presents an imminent danger to
        patients and/or other person either employed by or visiting Greater Southeast. All of
        the cases at issue in the so-called "peer review" were remote, having occurred some
        months prior, with all patients being subsequently discharged from Greater Southeast
        after treatment by Dr. Ali.

21.     The medical staff retained the services of Dr. Nutting, who is a cardiologist but not a
        vascular surgeon, to externally review Dr. Ali's cases at issue following the May 25,
        2005 meeting, apparently without providing him complete medical records or pre and
        postoperative radiographs of the involved patients.

22.     Nonetheless, Dr. Nutting reviewed the materials he was provided and produced a
        report to the medical staff concerning Dr. Ali which concluded that he had violated
        (in varying degrees) the standard of care in regards to the four patient cases under
        investigation by the medical staff.

23.    In each relevant case he reviewed, Dr. Nutting opined that Dr. Ali did not contribute to any patient's suffering a CVA, but failed to recognize the techniques utilized by Dr. Ali in performing atherectomies and other endovascular procedures and because he was not provided the relevant radiographs, could not ascertain that said procedures had actually been performed.

24.    Despite the assertions of Drs. Burr and Allen, Greater Southeast incorrectly reported Dr. Ali's surrender of his angioplasty privileges to the HPLA and the NPDB, claiming that Greater Southeast had investigated him and suspended all of his surgical privileges from on or about June 1, 2005 through August 18, 2005.

25.    On August 18, 2005, after reviewing Dr. Nutting's external review, the peer review committee at Greater Southeast reinstated Dr. Ali's surgical privileges with the exception of those to perform angioplasty, which he had previously voluntarily surrendered under duress from the medical staff officers and representatives.

26.    On January 26, 2006, the Administrator of HPLA, an agency of the District of Columbia, issued a *Notice of Summary Action to Suspend License* ("Notice") charging *inter alia* that Dr. Ali presented an "imminent danger to the health and safety of the residents of the District of Columbia...". D.C. Code, 2001 Ed. §§ 3-1205.14(a) and 3-1205.15(a). Said Notice contained four charges with specifications in support of said charges. Those charges included:

    a.    Charge I – willfully making a misrepresentation in treatment;

    b.    Charge II – willfully making or filing a false report or record in the practice of a health profession

  c. Charge III – failing to conform to standards of acceptable conduct and prevailing practice with a health profession; and

  d. Charge IV - demonstrating a willful or careless disregard for the health, welfare or safety of a patient

27. On January 30, 2006, Dr. Ali timely filed a Request for a Hearing before the District of Columbia Office of Administrative Hearings, said Hearing being conducted on February 9, 10 and 23, 2006, Dr. Ali successfully admitted numerous exhibits and presented Manisha Singal, MD, an internist, as an expert witness.

28. On February 28, 2006, by Order of the Honorable Jesse P. Goode, the District HPLA's Notice issued to Dr. Ali was reversed and vacated, his District of Columbia and Maryland Licenses being subsequently reinstated and Greater Southeast's Reports to the NPDB and FSMB being withdrawn of its own initiative. Judge Goode's decision is attached hereto and incorporated herein in its entirety by reference. ("Exhibit 1")

29. Pursuant to *HCQIA* at 42 U.S.C. § 11112(a) and as described in Greater Southeast's Medical Staff Bylaws, HPLA and Greater Southeast owed a duty of care to Dr. Ali in the performance of professional peer review amounting to a *per se* standard minimally commensurate with the immunity provisions.

30. Greater Southeast recklessly allowed and conspired with Dr. Nedd, a direct economic competitor of Dr. Ali, to initiate an unreasonable, fraudulent and unnecessary peer review and subverted what should have been a non-biased, fundamentally fair process into a vehicle to restrain trade.

31. Greater Southeast allowed Dr. Nedd to conspire with the Greater Southeast medical

staff leadership to effectively revoke Dr. Ali's surgical privileges through constructive summary suspension prior to the initiation or completion of any evidentiary fair hearing process and in the complete absence of any procedural due process as outlined in the applicable medical staff bylaws.

32.    Greater Southeast denied Dr. Ali the opportunity to meet with appropriate committees as contemplated in the applicable medical staff bylaws before initiation of action against his clinical privileges.

33.    Greater Southeast deprived Dr. Ali any hearing on the merits in regard to those allegations against him.

34.    Greater Southeast allowed and ratified Dr. Nedd's participation in the peer review process leading to Dr. Ali's summary suspension.

35.    Greater Southeast knew that Dr. Nedd was Dr. Ali's primary economic competitor and allowed him to participate in the investigative process when he was an obviously biased party with a conflict of interest.

36.    Dr. Nedd made false statements and presented a fraudulent internal peer review report to the Greater Southeast Medical Staff wrongfully and willfully critical of Dr. Ali's management of the four patients at issue in the peer review.

37.    Dr. Burr made false statements and wrongfully asserted that Dr. Ali was at fault in the management of those patients at issue who had experienced CVA's.

38.    Greater Southeast failed to exercise due care in summarily suspending Dr. Ali's surgical privileges based only upon allegations by Dr. Nedd prior to any external review or participation by a disinterested party.

39.    Greater Southeast failed to provide the Dr. Ali a detailed explanation as to the

specific reason and rationale on which its decision to suspend all of his surgical privileges was based when no merits hearing had been held and none of the cases at issue even involved open surgery, rather only endovascular techniques.

40.    Pursuant to the District's Medical Practices Act ("Act") codified at D.C. Code § 3-1205 et seq. at § 3-1205.15:

    **a.  If the Mayor determines, after investigation, that the conduct of a licensee presents an imminent danger (emphasis added) to the health and safety of the residents of the District, the Mayor may summarily suspend or restrict, without a hearing, the license to practice a health occupation.**

    **b.  The Mayor, at the time of the summary suspension or restriction of a license, shall provide the licensee with written notice stating the action that is being taken, the basis for the action, and the right of the licensee to request a hearing.**

    **c.  A licensee shall have the right to request a hearing within 72 hours after service of notice of the summary suspension or restriction of license. The Mayor shall hold a hearing within 72 hours of receipt of a timely request, and shall issue a decision within 72 hours after the hearing.**

***

Here, Dr. Ali never received any communication from the Mayor, only the HPLA and his license was suspended prior to any substantive investigation, the HPLA accepting the fraudulent allegations of Greater Southeast as true.  HPLA never documented, investigated nor noticed Dr. Ali as to how he presented any danger of imminent harm.

41.    Additionally, at § 3.1205.14(a), the Act describes those infractions, which, if committed by a practitioner, authorize the Board to exact discipline, including but not limited to licensure suspension or revocation (§ 3.1205.14(c)).  Dr. Ali never committed any of the named infractions, yet his license was summarily suspended prior to any hearing, without meaningful notice and without a meaningful investigation prior to his being deprived of a valuable property right, his license to practice medicine.

## V.    CLAIMS

### FIRST CAUSE OF ACTION:

### Deprivation of Federal Constitutional Rights Under Color of State Law, 42 U.S.C. § 1983 (As to Defendant District of Columbia)

Dr. Ali incorporates paragraphs (1) through (41) herein by reference as if fully restated and included herein.

42.    As an agency of the District of Columbia, Defendant HPLA is a state actor for purposes of litigation under 42 U.S.C. §1983 pursuant to applicable case law.

43.    Pursuant to 42 U.S.C. §1983 Dr. Ali must prove that under color of any statute, ordinance, regulation, custom, or usage, of the District of Columbia, the HPLA, an agency thereof, subjected him (or caused him to be subjected) to the deprivation of any rights, privileges, or immunities secured by the United States Constitution or any of its laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

44.    Defendant HPLA, as a state actor and agency of the District, acted under color of District of Columbia law while exercising its peer review, licensure and regulatory authority over Dr. Ali pursuant to the Act, to federal law and the Fourteenth Amendment of the United States Constitution.

45.    Despite the District's Medical Practice Act's guarantee of a proper investigation, the

HPLA failed to independently investigate the merits of Greater Southeast's allegations against Dr. Ali; per Judge Goode's decision, the HPLA relied upon hearsay and in many cases hearsay within hearsay from Greater Southeast.

46. The HPLA failed to hire an independent and disinterested qualified external reviewer to determine whether Dr. Ali had breached any applicable standard of care in his management of the patients at issue.

47. The HPLA utilized summary action to suspend Dr. Ali's license (which requires a risk of imminent harm under the District's Medical Practice Act) in lieu of routine due process procedure under the act wherein Dr. Ali would have been entitled to an evidentiary hearing prior to any action against his license.

48. The HPLA mimicked the fraudulent and improperly conducted peer review process at Greater Southeast, by misstating the same medical and endovascular errors opined by Drs Nedd and Nutting and misspelling the same patient names that it misspelled in its own paperwork.

49. Under color of District of Columbia law, Defendant HPLA subjected Dr. Ali, a United States citizen, to the deprivation of those rights, privileges, and immunities secured by the United States Constitution, specifically his Fourteenth Amendment due process and equal protection guarantees, through its deliberate indifference to fundamental Constitutional due process and the HCQIA indemnity provisions enumerated at 42 U.S.C. § 11112.

50. Defendant HPLA, as an instrumentality/agency of the District (a municipality for purposes of § 1983 litigation), after summary action to suspend Dr. Ali's license to practice medicine, failed to present a single witness with first hand knowledge of the

13

relevant facts as they transpired at Greater Southeast, rather a single investigator testified on behalf of the District and reported only hearsay or in many particular cases hearsay within hearsay. As such there could be no reasonable belief on HPLA's behalf that its actions were in the furtherance of quality health care.

51.    HPLA failed to make a reasonable attempt to obtain the facts pertaining to Dr. Ali's peer review matter at Greater Southeast and adjudicated him guilty prior to any hearing on the merits in utilizing summary process to suspend his license to practice in the District, the State of Maryland subsequently adopting its findings.

52.    HPLA failed to afford Dr. Ali Fourteenth Amendment due process or, even at a minimum, an evidentiary hearing prior to depriving him of a recognized valuable property, his professional license to practice his chosen profession of medicine, and specifically vascular and transplant surgery.

53.    HPLA did not have a reasonable belief that its actions against Dr. Ali were warranted by the facts known as no reasonable effort to obtain the facts had occurred, no evidentiary hearing procedures been employed, and it apparently relied solely on hearsay and in many cases, hearsay within hearsay.

54.    By summarily suspending Dr. Ali's medical license in the absence of direct evidence of any violation of the Medical Practice Act and with the deficiencies as pled above, HPLA, under color of District law, violated his Constitutional rights with said violation being at a minimum negligent and alternatively amounting to deliberate indifference to his Fifth and Fourteenth Amendment Due Process rights and for which Dr. Ali is hereby petitioning for redress.

55.    Said actions and inactions by HPLA are a proximate cause and cause in fact of Dr.

Ali's damages as pled below.

## SECOND CAUSE OF ACTION:
### Negligence in Investigative and Procedural Peer Review Process
### (As to Defendants Greater Southeast and District of Columbia)

Dr. Ali incorporates paragraphs (1) through (55) herein by reference as if fully restated and included herein.

56.    HPLA as an agency of the District of Columbia and Greater Southeast owed a duty of care to the Dr. Ali in the performance of professional peer review and licensure investigation, respectively, amounting at a minimum to a per se standard minimally commensurate with the immunity provisions of *HCQIA* at 42 U.S.C. § 11112(a), the Act as previously cited and as described in Greater Southeast's Medical Staff Bylaws.

57.    HPLA, as an instrumentality of the District (a municipality for purposes of § 1983 litigation) owed Dr. Ali Fourteenth Amendment due process as a state actor in this context.

58.    HPLA, under the Act, owed a duty to Dr Ali to adequately investigate those allegations made against him by Greater Southeast prior to summarily suspending his license to practice, an action that derivatively proximately and directly caused the loss of his license(s) to practice.

59.    Greater Southeast, acting with malice and in contravention of its Medical Staff Bylaws, and HPLA negligently, breached said respective duties, and in the case of Greater Southeast, the applicable medical staff bylaws in the following particulars:

**AS TO GREATER SOUTHEAST:**

a.    In recklessly allowing and conspiring with Dr. Nedd, a direct economic competitor of Dr. Ali, to initiate an unreasonable and unnecessary peer review and

subvert what should have been a non-biased, fundamentally fair process into a vehicle of trade restraint, wherein Dr. Ali was unable to effectively compete with Dr. Nedd, or even practice medicine at all for a prolonged period, his reputation and professional standing continuing to suffer;

b. In allowing Dr. Nedd to conspire with the Greater Southeast medical staff leadership to effectively revoke Dr. Ali's surgical privileges through constructive summary suspension prior to the initiation or completion of any evidentiary fair hearing process and in the complete absence of any procedural due process as outlined in the applicable medical staff bylaws;

c. In denying Dr. Ali the opportunity to meet with appropriate committees as contemplated in the applicable medical staff bylaws before initiation of action against his clinical privileges, particularly when he had not received any hearing on the merits in regard to those allegations against him;

d. In initially allowing and ratifying Dr. Nedd's participation in the peer review process leading to Dr. Ali's summary suspension and in allowing his ongoing participation in the investigative process when he was an obviously biased party with a conflict of interest (since Dr. Ali was Dr. Nedd's primary economic competitor;

e. In failing to exercise due care in summarily suspending Dr. Ali's surgical privileges based only upon allegations by Dr. Nedd prior to any external review or participation by a disinterested party; and

f. In failing to provide the Dr. Ali a detailed explanation as to the specific reason and rationale on which its decision to suspend all of his surgical privileges was

based when no merits hearing had been held and none of the cases at issue even involved open surgery, rather only endovascular techniques.

**AS TO THE DISTRICT OF COLUMBIA:**

g.  In failing to investigate independently the merits of Greater Southeast's allegations against Dr. Ali, instead relying upon hearsay and in many cases hearsay within hearsay per Judge Goode's decision;

h.  In failing to independently hire a disinterested qualified external reviewer to determine whether Dr. Ali had breached any applicable standard of care in his management of the patients at issue;

i.  In utilizing summary action to suspend Dr. Ali's license (which requires a risk of imminent harm under the District's Medical Practice Act) in lieu of routine due process procedure under the act wherein Dr. Ali would have been entitled to an evidentiary hearing prior to any action against his license;

j.  In mimicking so closely the fraudulent and improperly conducted peer review process at Greater Southeast, not only in misstating the same medical and endovascular errors opined by Drs Nedd and Nutting, but in even misspelling the same patient names.

60.  Greater Southeast's and the District of Columbia's (through HPLA) cumulative actions are a proximate cause and cause in fact of the Dr. Ali's substantial damages alleged below.

### THIRD CAUSE OF ACTION:
**Breach of Contract (As to Defendant Greater Southeast)**

Dr. Ali incorporates paragraphs (1) through (60) herein by reference as if fully restated and included herein.

61. In order to prevail in a claim for breach of contract, a plaintiff must prove:

    a. An existing contract;

    b. Knowledge by defendant of the contract;

    c. Intentional procurement of its breach by the defendant; and

    d. Damages resulting from the breach.

62. Greater Southeast's medical staff bylaws represent a binding contract entered into by the respective parties, in this case Greater Southeast, who granted Dr. Ali a right to practice surgery as a member of its clinical staff exchanging said right for a bilateral duty of compliance with the Medical Staff Bylaws.

63. Said bilateral duty of compliance was renewed biannually when Dr. Ali was re-credentialed and reappointed to the medical staff, assenting to abide by Greater Southeast's Medical Staff Bylaws.

64. Greater Southeast, through its agents and representatives knowingly and maliciously failed to perform its duty to Dr. Ali under its bylaws by failing to exclude the influence of Dr. Nedd, a known direct economic competitor of Dr. Ali and/or at a minimum obtain a qualified external review of his endovascular work prior to summarily suspending his surgical privileges.

65. Greater Southeast, through its agents and representatives knowingly and maliciously failed to perform its duty to Dr. Ali under its bylaws by failing afford Dr. Ali an evidentiary hearing as contemplated in the applicable Medical Staff Bylaws.

66. Greater Southeast, through its agents and representatives knowingly and maliciously failed to perform its duty to Dr. Ali under its bylaws by misapplying and abusing the summary suspension procedure described in the Medical Staff Bylaws, wherein

summary suspension is reserved for situations where action must be taken immediately in the best interest of patient care in the hospital (in the absence of an evidentiary hearing); such was not the case here, where the Dr. Ali posed no danger to patient care whatsoever.

67.    Greater Southeast fraudulently intended to breach its contract with Dr. Ali based upon knowingly false information presented within Dr. Nedd's internal review and the external review of Dr. Nutting that Dr. Ali breached applicable standards of care in the patient cases at issue. Dr. Burr chose to shift proper culpability for the patients' at issue CVA's to Dr. Ali alleging that Dr. Ali breached applicable standards of care when the patients' CVA's rightfully were the fault of the Anesthesia Department. No such breaches had truly occurred, nor could they in any way be attributed to Dr. Ali.

68.    Here, multiple fraudulent acts accompanied the breach in the medical staff bylaws, namely:

    a.    Dr. Nedd knowingly submitted a false and fraudulent internal review of the involved patient cases.

    b.    Dr. Nutting knowingly submitted a false and fraudulent external review of the involved patient cases.

    c.    Dr. Burr fraudulent knowingly and fraudulently affirmed the false and fraudulent reviews of Drs. Nedd and Nutting.

    d.    Dr. Burr wrongfully implicating Dr. Ali in the patient complications at issue in the peer review, knowing in reality any breaches in applicable standards of care occurred only in the patients' anesthesia management.

69.    The summary suspension of Dr. Ali's surgical privileges by the medical staff when the medical staff and particularly Dr. Burr knew, or should have known, that the Anesthesia Department was the culpable party, that Dr. Ali had breached no applicable standards and that summary suspension was not warranted was a breach of the applicable bylaws, as Dr. Ali did not impose a threat of imminent harm to anyone.

70.    Drs. Allen and Burr fraudulently asserted that if Dr. Ali surrendered his angioplasty privileges that no reporting to the NPDB, HPLA and/or other relevant entities would occur.

71.    These and other breaches in the applicable Medical Staff Bylaws were a proximate cause and cause in fact of the damages sustained by Dr. Ali as pled below.

## FOURTH CAUSE OF ACTION:
### Promissory Estoppel as Alternative to Breach of Contract
### (As to Defendant Greater Southeast)

Dr. Ali incorporates paragraphs (1) through (71) herein by reference as if fully restated and included herein.

72.    In order for a plaintiff to prove a claim of promissory estoppel they most prove:

a.    The existence of a promise; which

b.    The promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce detrimental reliance; and

c.    Which is binding if injustice can be avoided only by enforcement of the promise.

73.    Reliance upon the Greater Southeast Medical Staff Bylaws by a member of the medical staff such as Dr. Ali is expected and foreseeable by Greater Southeast as the party drafting said bylaws and making the promises therein.

74. Greater Southeast's Medical Staff Bylaws expressly promised Dr. Ali certain specific substantive and procedural rights that are unambiguous in their terms.

75. Pursuant to the bylaws summary suspension is reserved for specific instances wherein imminent harm threatens the best interest of patient care.

76. Pursuant to the bylaws Dr. Ali was entitled to a review by an investigatory ad hoc committee.

77. Dr. Ali reasonably relied upon said promises contained in the Greater Southeast Medical Staff Bylaws to encompass physician members of the medical staff such as him.

78. As a direct and proximate result of his detrimental reliance upon the Greater Southeast Medical Staff Bylaws, Dr. Ali sustained those damages as pled below.

**FIFTH CAUSE OF ACTION:**
**Tortuous Interference with Prospective Business Advantage and Contract**
**(As to Defendants Greater Southeast, the District of Columbia, Dr. Burr and Dr. Nedd)**

Dr. Ali incorporates paragraphs (1) through (78) herein by reference as if fully restated and included herein.

79. In order for a plaintiff to prevail in a claim for tortuous interference with prospective business advantages and contract they must prove:

    a. The existence of a contract;

    b. Knowledge of the contract;

    c. Intentional procurement of a breach of the contract; and

    d. Damages resulting from the breach.

80. Dr. Ali maintained an express contract with Greater Southeast thru its applicable Medical Staff Bylaws where he was allowed to practice vascular surgery.

21

81.    Dr. Ali maintained express contracts with numerous managed care entities as a member of their respective provider panels and implied contracts with his individual patients, both mandating the delivery of professional quality general surgical health care services.

82.    Greater Southeast, Dr. Nedd, Dr. Burr and the District of Columbia (through HPLA) knew or should have known of the existence of these contracts.

83.    Drs. Nedd and Burr, intentionally, maliciously and fraudulently caused the breach of the Greater Southeast Medical Staff Bylaws, acting in concert with Greater Southeast tortuously interfered with Dr. Ali's express managed care contracts and implied patient-physician contracts.  Likewise, the District (through HPLA) tortiously interfered with Dr. Ali's express contract and implied contracts through denying him due process of law under the Fourteenth Amendment of the U.S. Constitution.

84.    As a direct and proximate result of Drs. Nedd, Burr and Greater Southeast bad-faith peer review and deprivation of fundamental due process rights Dr. Ali was harmed in his existing patient and managed care contracts, their resulting termination, as well as Dr. Ali's inability to obtain prospective economic advantage through similar future contracts with patients and managed care entities.

85.    Dr. Nedd's and Greater Southeast's actions directly and tortuously interfered with patient-third parties contracting with the Dr. Ali and his practice as his patients were unable to obtain hospital-based services from him following his summary suspension and later revocation of clinical privileges.

86.    Said actions on the part of the District, Greater Southeast and Dr. Nedd occurred without justification whatsoever and furthered the anticompetitive and unfair trade

practice conspiracy as described.

87.  Said actions were a proximate cause and cause in fact of the damages sustained by

Dr. Ali as pled below.

## SIXTH CAUSE OF ACTION:
### Fraudulent Misrepresentation
### (As to Defendants Greater Southeast, Dr. Burr and Dr. Nedd)

Dr. Ali incorporates paragraphs (1) through (87) herein by reference as if fully restated

and included herein.

88.  In order for a plaintiff to succeed in a claim of fraud they must prove:

a.  A false representation;

b.  Made in reference to a material fact;

c.  With knowledge of its falsity;

d.  With the intent to deceive; and

e.  An action that is taken in reliance upon the representation.

89.  Drs. Allen, Nedd, Burr and Greater Southeast, through its organized medical staff,

made knowingly false representations to Dr. Ali in communicating and assuring him

that if he surrendered his angioplasty privileges, no further action would be taken

against him and no reports would be made to municipal, state and/or federal agencies.

90.  Dr. Ali knew his ability to practice medicine and earn a living would be compromised

if a negative report was made to any municipal, state and/or federal agencies and he

would not have agreed to surrender said privileges had he known a report would be

generated.

91.   Agents of Greater Southeast, through its organized medical staff, made these statements to Dr. Ali with the intent to deceive and to force him to surrender his angioplasty privileges.

92.   Dr. Ali relying to his detriment on the false and deceiving representations surrendered his angioplasty privileges at Greater Southeast and elected not to vigorously defend his professional conduct.

93.   Said fraudulent misrepresentation was a proximate cause and cause in fact of those damages sustained by Dr. Ali as pled below.

## SEVENTH CAUSE OF ACTION:
## Negligent Misrepresentation (As to Defendants Greater Southeast, Dr. Burr and Dr. Nedd)

Dr. Ali incorporates paragraphs (1) through (93) herein by reference as if fully restated and included herein.

94.   Under District of Columbia law, in order for a plaintiff to succeed in a claim of negligent misrepresentation they must prove:

   a.   That the Defendant(s) negligently communicated false information;

   b.   That the Defendant(s) intended or should have recognized that Plaintiff would likely be imperiled by action taken in reliance upon the misrepresentation; and

   c.   That plaintiff reasonably relied upon the false information to his detriment.

95.   Drs. Burr and Allen, on behalf of Greater Southeast made false statements and/or omissions of fact when they assured Dr. Ali that as no investigation had formally been undertaken in the peer review arena and that no report would be generated to HPLA, the NPDB and other municipal, state and federal agencies.

96.   Dr. Nedd negligently represented that Dr. Ali had breached applicable standards of care in his management of the patients at issue in the peer review.

24

97.    Statements by agents of Greater Southeast' violated the duty to exercise reasonable care in the conduct of professional peer review.

98.    Drs. Nedd and Burr, in their wrongful allegations against Dr. Ali, acted outside the scope of their respective agencies at Greater Southeast.

99.    The false statements and/or omissions involved material issues upon which Dr. Ali reasonably relied to his detriment in assuming that if he cooperated and voluntarily surrendered his angioplasty privileges at Greater Southeast, he could continue to practice at Greater Southeast and not be disparaged through a formal report which could affect his ability to practice medicine.

100.    Said negligent misrepresentations were a proximate cause and cause in fact of those damages sustained by Dr. Ali as pled below.

### EIGHTH CAUSE OF ACTION:
### Intentional Infliction of Emotional Distress
### (As to Defendants Dr. Nedd, Dr. Burr, the District of Columbia and Greater Southeast)

Dr. Ali incorporates paragraphs (1) through (100) herein by reference as if fully restated and included herein.

101.    Under District of Columbia law, in order for a plaintiff to succeed in a claim of intentional infliction of emotional distress they must prove:

a.    Extreme and outrageous conduct on the part of the defendant which;

b.    Either intentionally or recklessly;

c.    Causes the plaintiff severe emotional distress.

102.    Greater Southeast's, Dr. Burr's and Dr. Nedd's intentional conduct in promulgating and conducting a bad-faith peer review, wrongfully resulting in the loss of Dr. Ali's medical licenses in the District and Maryland was extreme and outrageous.

103.  The District of Columbia, through HPLA, acted intentionally in ratifying the fraudulent and unproven peer review findings of Greater Southeast (largely based upon Dr, Nedd's internal review) without independent verification, independent qualified external review and in utilizing summary action as opposed to its routine procedural methods (which would have afforded due process and an evidentiary hearing) in acting against Dr. Ali's license.

104.  Greater Southeast in retaining Dr. Nutting as an external reviewer failed to choose a properly qualified individual with endovascular experience equivalent to Dr. Ali's and then failed to provide his with full documentation, including, but not limited to the relevant patient radiographs.

105.  Dr. Burr's, Greater Southeast's and Dr. Nedd's conduct to promulgate the biased, anticompetitive and unsupported allegations of substandard medical care by Dr. Ali to the advantage of his chief economic competitor, has been unequivocally atrocious, outrageous in character, so extreme in degree as to go beyond all bounds of decency and is utterly intolerable in a civilized community.

106.  Greater Southeast, HPLA, Dr. Burr and Dr. Nedd acted intentionally against Dr, Ali to inflict anhedonia, profound misery, shame, disgrace, depression, anxiety, loss of enjoyment of life and severe emotional distress including physical illness and injury. These damages are in addition to those pled below.

107.  A special relationship exists between physicians and hospital entities such that unjust deprivation of clinical privileges is akin to termination of a *de facto* employer-employee relationship and likewise has substantial impact on the third party physician-patient special relationship.

108.   As a result of this special relationship a lower standard of outrageous conduct should

be applicable herein for the Dr. Ali to viably state this claim against these Defendants.

**NINTH CAUSE OF ACTION:**
**Violation of District of Columbia Unlawful Trade Practices Act**
**(As to Defendant Wilton Nedd, MD)**

Dr. Ali incorporates paragraphs (1) through (108) herein by reference as if fully restated

and included herein.

109.   Pursuant to the District of Columbia Unlawful Trade Practices Act in order to

succeed on a claim brought under the Act a plaintiff must prove that:

a.   The Defendant(s) disparaged the goods, services, or business of another by false

or misleading representations of material facts; or

b.   The Defendant(s) represented that goods or services are of particular standard,

quality, grade, style, or model, if in fact they are of another; or

c.   The Defendant(s) misrepresented as to a material fact that has a tendency to

mislead.

110.   Dr. Nedd falsely and fraudulently represented that Dr. Ali's professional services as a

vascular surgeon were characteristically inferior to those of his peer group.

111.   Dr. Nedd falsely and fraudulently represented that Dr. Ali's professional services as

an endovascular surgeon were of an inferior standard, and quality, when in reality

they were superior to those previously available at Greater Southeast.

112.   Dr. Nedd falsely and fraudulently misrepresented material facts pertaining to Dr. Ai's

professional services which had a tendency to mislead; failed to state certain material

facts tending to mislead; and disparaged the professional services of Dr. Ali by false

and/or misleading representations of material facts, all in violation of D.C. Code § 28-2904.

113.    Violation of this statute was a proximate cause and cause in fact of those damages sustained by Dr. Ali as pled below.

## VI.    DAMAGES

114.    Based upon the prior claims, Dr. Ali has been injured in various ways, as set out below, and is entitled to damages including but not limited to the following.

115.    As a result of these violations Dr. Ali sustained damage in the form of his property interest in his two medical licenses, which resulted in his inability to perform surgery at any Hospital's facilities or to practice in his private office during the time he was unlicensed.

116.    As a direct and proximate result of Defendants' acts and/or omissions, Dr. Ali has sustained damages in an amount exceeding $75,000.00 for loss of income and other financial injuries (an exact amount to be determined at trial).

117.    As a direct and proximate result of Defendants' acts and/or omissions, Dr. Ali has sustained damage in the form of present and subsequent humiliation, present and subsequent loss and/or stigmatization of reputation, present and subsequent loss of dignity, present and subsequent loss of patient referrals, present and subsequent significant pecuniary loss, present and subsequent loss of managed care and insurance contracts and their inherent value, substantial attorney fees in defending against the charges, coincident inability to be licensed in other jurisdictions and loss of ability to obtain privileges at multiple Health Systems, present and subsequent physical

distress, emotional distress, anhedonia, loss to reputation, loss to future advantageous career opportunities, emotional distress, and harm to his family life.

118.    Under 42 U.S.C. § 1983, Dr. Ali is entitled to compensatory and punitive damages, against all applicable Defendants for the losses he sustained as the result of their actions and attorney fees.

119.    Dr. Ali seeks, as appropriate, attorney's fees, interest and costs and such other legal and equitable relief as the Court may deem appropriate.

**WHEREFORE**, Plaintiff, Dr. Ali, prays for relief against Defendants, Envision Hospital Corporation, d.b.a. Greater Southeast Hospital of Washington, the District of Columbia on behalf of its Department of Health, Health Regulation and Licensing Administration, Wilton Nedd, M.D., and Scott Burr, M.D., under his claims against said Defendants as asserted above, and for all other relief just and proper in the premises.

## VI.    REQUEST FOR TRIAL BY JURY

Comes now Plaintiff, Dr. Ali, and requests a trial by jury with respect to all claims asserted herein.

Respectfully Submitted,

**MEDICOLEGAL CONSULTANTS, LLC**

C. William Hinnant, Jr. MD JD
Federal Bar # 9129
112 Essex Drive
Anderson, SC 29621
(864) 226-6132, Fax: 864-225-0830

Dated:  April 23, 2008
Anderson, South Carolina

**ATTORNEY FOR DR. ALI**

**DISTRICT OF COLUMBIA**
**OFFICE OF ADMINISTRATIVE HEARINGS**
825 North Capitol Street, NE, Suite 4150
Washington, DC 20002-4210

IN RE:

AHMED ALI, M.D.
      Respondent

Case No.: DH-B-06-800032

### FINAL ORDER

## I.    Introduction

This case arises under the District of Columbia Health Occupations Revision Act of 1985, D.C. Code, 2001 Ed. § 3-1205.15. On January 30, 2006, this administrative court received a request for a hearing by Respondent Ahmed Ali, M.D., regarding a *Notice of Summary Action to Suspend License* ("Notice") issued by the Administrator, Department of Health, Health Professional Licensing Administration, on January 26, 2006. The Notice charged that Respondent's conduct "presents an imminent danger to the health and safety of the residents of the District of Columbia . . . ." D.C. Code, 2001 Ed. §§ 3-1205.14(a) and 3-1205.15(a). There were four charges with multiple "specifications" in support of each charge specified in the Notice. The charges against Respondent were:

| | |
|---|---|
| Charge I: | willfully making a misrepresentation in treatment; |
| Charge II | willfully making or filing a false report or record in the practice of a health profession; |
| Charge III: | failing to conform to standards of acceptable conduct and prevailing practice with a health profession; and |
| Charge IV: | demonstrating a willful or careless disregard for the health, welfare, or safety of a patient. |

The specifications concerning each charge surround the treatment of four of Respondent's patients. Specifically, in Charge I, Respondent is alleged to have failed to properly document the operative procedures he engaged in with three patients (Wayne Tucker, James Hickman, and Lillian Jones); in Charge II, Respondent is alleged to have failed to document that three patients (Wayne Tucker, James Hickman, and Lillian Jones) suffered intraoperative cardio-vascular accidents ("CVA") during declotting procedures he preformed; in Charge III, Respondent is alleged to have used sodium bicarbonate (NaHCO3) as an additive to lidocaine (an local anesthetic) while performing declotting procedures on four patients (Wayne Tucker, James Hickman, Lillian Jones, and Robert Miller), performed an angioplasty of the left subclavian vein on Robert Miller after it was determined that the innominate vein was completely occluded, and that Respondent is a general surgeon, but not a vascular surgeon; finally, in Charge IV, it is alleged that all of the specifications contained in Charges I-III constituted "willful or careless disregard for the health, welfare, or safety" of patients.

On January 31, 2006, I issued a Case Management Order scheduling a hearing for February 2, 2006, pursuant to D.C. Code, 2001 Ed. § 3-1205.15(c) (a hearing shall be held within 72 hours of receipt of a timely request). On February 1 and 2, 2006, telephone status conferences were held with counsel for both parties represented. During the conference held on February 2, 2006, Respondent moved for a continuance so that he could better prepare for the hearing. The Government consented to the motion. On February 2, 2006, I issued an Order granting Respondent's request, and set the hearing for February 9, 2006.

The hearing commenced on February 9, 2006, and at the parties' request was carried over to February 10 and 23, 2006. The Government was represented by Michael Stern, Assistant Attorney General, and Respondent was represented by Alan Dumoff, Esq. At the

-2-

commencement of the hearing, Respondent moved to dismiss the matter, as the Government had failed to plead a case that satisfied the statutory burden of establishing that Respondent's conduct was an "imminent danger to the health and safety of residents of the District of Columbia." The Government objected to this motion. The administrative court denied the motion, on the record, as Respondent's argument was predicated upon a review of the documents pre-filed by the Government. In other words, Respondent's argument required the court to look beyond the bare facts alleged in the Notice to determine that the Government had not pled a prima facie case, which means the request was for, in essence, summary judgment.

Gregory Scurlock, Supervisory Investigator, D.C. Department of Health, testified in the Government's case in chief. Respondent and Manisha Singal, M.D. testified in Respondent's case in chief. Dr. Singal was qualified, without objection, as an expert witness in the area of internal medicine and Respondent was qualified as an expert witness in the area of general surgery and hemodialysis vascular access surgery. During the course of the hearing, the Government's exhibits 101-111 were admitted into evidence and Respondent's exhibits 200-242 were also admitted into evidence.

Based upon the testimony of the witnesses, my evaluation of their credibility, and the admitted documentary evidence, I make the following findings of fact and conclusions of law.

## II. Findings of Fact

1. Respondent is licensed to practice medicine in the District of Columbia and the State of Maryland. He has been licensed in the District since 1979 and in Maryland since approximately 1980. Respondent is a vascular surgeon with specialties in kidney transplantation and hemodialysis vascular access surgery.

2.  Respondent received his M.D. degree from Cairo University Faculty of Medicine in 1975, completed his internship at Cairo University in 1977, and received post-graduate training from 1978 to 1984 at the Washington Hospital Center ("WHC") (surgical residency and a fellowship in kidney transplantation) and in 1995 at the Arizona Heart Institute (endovascular surgery).  Exhibit 200.  Respondent was board-certified in surgery with the American Board of Surgery in 1987.  Respondent is also a member of different surgical societies.  Exhibit 201. Respondent has taken other continuing medical education courses, and is a published author on transplant surgery.  Exhibit 200.

3.  "Angioplasty" is a medical procedure where by external pressure on an artery is relieved by insering and inflating a balloon catheter in the artery.  The inflated catheter pushes back the external material that is constricting the artery, opens the artery and allows the free(r) flow of blood through the artery.

4.  An "atheroma" is a structural change in the lumen (interior) of an artery.  An atheroma is not a clot, but is, rather, a build up of tissue or plaque in the lumen.  In hemodialysis patients,[1] an atheroma decreases the flow of blood through grafts (which are surgically inserted in the patient's body to effectuate the movement of blood in and out of the patient during dialysis). The changes in the lumen of an artery associated with an atheroma can lead to clotting in the graft, which presents significant problems for hemodialysis patients, including the need to

---

[1]  "Hemodialysis" is the process whereby a patient whose kidney's cannot effectively clean and purify their blood, have their blood removed from an artery purified through dialysis and returned to the patient through a vein.

-4-

abandon a graft (which requires additional surgery), other illness or death.[2]  Exhibit 205
(paragraph 6).

5. An "atherectomy" is a medical procedure in which an atheroma is removed from an
artery.[3] Exhibits 205 (paragraph 5) and 212.  An atherectomy can be performed by surgically
opening the artery, or percutaneously[4] (through the skin) by inserting a catheter[5] into the lumen,
and removing the atheroma. Exhibits 205 (paragraph 5), 212, 213.  If a catheter is used, there
are a variety of tools and techniques available to the surgeon, including an "angioplasty" catheter
or a rotational atherectomy catheter.

6. A "cerebral-vascular accident" ("CVA") is the temporary or permanent loss of
function of one or more part(s) of the brain.  A CVA is typically caused by a loss of oxygen to
the brain.  Common examples of a CVA are a stroke (when a ruptured blood vessel deprives
portions of the brain from receiving oxygen), or a transient ischemic attack.  CVAs are caused by
many medical conditions and procedures; including conditions such as end-stage renal disease
secondary to vascular illness (e.g. hypertension or diabetes), or procedures such as over-sedation
during surgery (over-sedation can cause irregular heart rhythm, which can cause irregular blood
flow, which can cause a CVA).  Patients with end-stage renal disease secondary to vascular
illness are at great risk of a CVA during surgery.  A surgical patient who has been sedated may

[2] If a hemodialysis patient has an atheroma in an artery and clot in the attached graft, but only receives a
thrombectomy to remove the clot, the continued presence of the atheroma will hasten the death of the
graft, such that a graft may only last two to three years compared to a potential eight to nine years.

[3] An "artery" is a blood vessel that carries oxygenated blood away from the heart.

[4] When compared to surgical processes, percutaneous procedures require additional training and skill to
successfully perform

[5] "Catheter" means one of many devices, using very different means, which are inserted into a blood
vessel with the goal of opening the vessel and improving the flow of blood.

Case No. DH-B-06-800032

have a CVA during surgery that goes unnoticed until after the effects of sedation wear off in post-operative care and the patient regains consciousness. Exhibits 205 (paragraph 8) and 206 (paragraph 4).

7. The "innominate" vein[6] is the vein formed by the joining of the jugular and subclavian veins in the chest cavity. The innominate vein leads to the superior vena cava vein, which, in turn, leads to the heart.

8. "Operative Reports" are written by a surgeon immediately after (preferably) surgery is completed. The Operative Report includes technical information regarding a patient's surgery. Post-operative concerns, observations and findings are reported in "Progress Notes" made by the attending post-operative physician and post-operative nursing staff.

9. "Stenosis" is the narrowing of an artery or vein.

10. A "subacute infarct" is an area of the brain with diminished blood flow that is more than 24 hours old.

11. The "subclavian" veins are located just below the clavicle bone (collar bone) on both sides of the chest cavity. The subclavian vein joins with the jugular vein to form the innominate vein.

12. A "thrombus" is a clot in an artery or graft.

13. A "thrombectomy" is a medical procedure whereby a thrombus is removed from an artery or graft. A "Fogerty" catheter is a tool frequently used in a thrombectomy to remove a thrombus. Exhibit 205 (paragraph 5).

---

[6] A "vein" is a blood vessel that carries blood toward the heart.

14. Lidocaine is a local anesthetic that is commonly used in hospitals to control pain in a variety of circumstances. Exhibits 217, 218 and 219. Lidocaine is highly acidic and an injection of lidocaine has been compared to receiving a shot of "molten lava." Exhibit 217. However, if lidocaine is diluted, 9 to 1, with sodium bicarbonate (baking soda), the pH adjustment greatly diminishes the pain felt by recipients of the shot. Exhibits 205 (paragraph 9), 206 (paragraph 9), 217, 218, and 219. The chemical formula for sodium bicarbonate is "$NaHCO_3$." Exhibits 242, 243. The use of sodium bicarbonate "presents no significant risk to the patient." Exhibit 205 (paragraph 9) and exhibit 206 (paragraph 5).

15. An anesthesiologist is required to diagnose and treat "clinical problems which occur during the [surgical] procedure." Exhibit 241 (page 2).

16. In 2002, Respondent was encouraged by Mr. Singh Taneja and Dr. Maurice McCreary (then Chair of Surgery at Greater Southeast Hospital ("GSH")), to open a vascular access center at GSH, where he would perform different surgical procedures including: inserting grafts, angioplasties, atherectomies, and thrombectomies. At the time, GSH was being reviewed for sub-optimal performance with regard to vascular access surgery. Given Respondent's education and experience, he was told that he would be a benefit to GSH and its patients. GSH made Respondent a member of its medical staff in November 2002. Exhibit 202.

17. Prior to accepting this responsibility, Respondent was working at George Washington University Hospital "("GW"). On average, the patients at GSH are more economically disadvantaged than those at GW. On average, patients receiving hemodialysis at GSH have more complicated health problems than those at GW.

18. Respondent's approach to hemodialysis vascular access surgery is state of the art, as evidenced by his use of minimally invasive procedures (e.g. endovascular processes), ensuring that patients with an atheroma and clot receive both an atherectomy and thrombectomy, and adding sodium bicarbonate to lidocaine.

19. Economically disadvantaged patients with complicated health problems frequently are the last to benefit from state of the art procedures. The former D.C. General Hospital, which treated a large number of indigent patients, did not make available state of the art vascular access procedures to patients. Prior to his transfer to GSH, doctors there were using medical procedures that satisfied the standard of care, but were less patient-friendly than Respondent's.

20. Wilton Nedd, M.D. is a cardiac surgeon who, at all times relevant to this decision, had surgical privileges at GSH. While at GSH, Dr. Nedd focused his practice on vascular access surgery. Dr. Nedd directly competes with Respondent for patients, income and prestige in the community.

21. Dr. Nutting is an independent physician retained by GSH to review certain patient records of Respondent (discussed in detail below). From the record presented, it is clear that Dr. Nutting was not provided all of the records associated with these patients (e.g. he did not get Respondent's office records or the pre- and post-operative films (angiogram/arteriogram) of each patient). Dr. Nutting does not know Respondent.

22. Wayne Tucker was a 47-year old patient of Respondent's when he underwent surgery on February 3, 2005 from approximately 10:00 a.m. until 12:45 p.m. Exhibit 221. Mr. Tucker had been Dr. Nedd's patient. Mr. Tucker's pre-operative diagnoses included: a) thrombus in his right arm vascular graft; b) atheroma and stenosis of his right brachial artery;

-8-

c) bilateral subclavian stenosis; and d) end-stage renal disease. Ibid. Mr. Tucker was very sick as he also had insulin-dependent diabetes. Exhibits 108 and 220. Mr. Tucker's anesthesiologist was Dr. Mogol. Exhibit 221, 222.

23. Respondent performed an atherectomy and thrombectomy on Mr. Tucker. Exhibit 220 (page 2). During the course of surgery, Mr. Tucker's oxygen saturation level fell from the optimal level of 100 to 83. Exhibit 221. This condition may have resulted from over-sedation, but this court makes no finding in this regard. Exhibit 108. Whether over-sedation was the cause or not of the decrease in oxygen saturation, Mr. Tucker was heavily sedated, such that during surgery it was not possible to ascertain whether Mr. Tucker had suffered from a CVA.

24. After Mr. Tucker was taken to post-operative care and approximately one hour and fifteen minutes had passed, the effects of sedation had worn off sufficiently for Dr. Mogol to first notice weakness in Mr. Tucker, indicating that he may have suffered a CVA. Exhibit 222. Approximately two hours later, a physician was called to ascertain whether Mr. Tucker had in fact suffered a CVA (exhibit 223); concluding that he had, GSH transferred Mr. Tucker to Washington Hospital Center at approximately 6:20 p.m. Exhibit 224 (page 2).

25. Dr. Nutting conducted a review of Respondent's provision of care to Mr. Tucker. Exhibit 108. Dr. Nutting found that Respondent reported in his Operative Report (exhibit 220) that he conducted an atherectomy, but the discussion portion of the notes do not bear out Respondent's conclusion. Dr. Nutting determined this based on his view that "[t]o perform an atherectomy, an atherectomy device is required. That device shaves and removes atheroma." Exhibit 108 (page 2). Dr. Nutting also found that Respondent had not obtained a pre-operative radiograph. Exhibit 108 (page 3). Based on these findings, Dr. Nutting concluded that

Case No. DH-B-06-800032

Respondent's actions were a "significant deviation from the standard of care," with no harm to the patient. Exhibit 108 (page 3).

26. In Respondent's Operative Report, he specifically mentioned that "the angioplasty balloon catheter was inserted through the introducer sheath to the right brachial artery and based on the initial arteriogram . . ." the artery was dilated. Exhibit 220 (page 2). Additionally, Respondent wrote that he inserted a "Fogerty catheter to extract the large atheroma." Ibid. These passages indicate that Respondent did have a pre-operative radiograph ("initial arteriogram") and had performed an atherectomy (the artery was dilated using an angioplasty catheter and the atheroma was removed using a Fogerty catheter), though Respondent had neglected to identify which atherectomy device he used during this procedure.

27. It appears that Dr. Nutting did not see Respondent's reference to an "initial arteriogram." Dr Nutting was also hamstrung by not having this initial arteriogram because if he had, he could have ascertained (by comparing the pre- and post-operative arteriograms) whether Mr. Tucker had an atheroma and whether Respondent had successfully removed an atheroma from Mr. Tucker. These materials would have taken the guess work out of Dr. Nutting's assignment. Further, it appears that Dr. Nutting did not understand that an atherectomy can be performed without using an atherectomy device that "shaves" the atheroma.[7] There are other means of dilating an artery and removing the atheroma that are acceptable and within the governing standard of care, such as an angioplasty catheter. Exhibits 212-216.

28. James Hickman was a 58-year old patient of Respondent's when he underwent surgery on October 14, 2004. Exhibit 221. Mr. Hickman was anesthetized from 12:00 p.m. until approximately 1:50 p.m. by Dr. Mogol. Exhibit 231. Mr. Tucker had been Dr. Nedd's patient.

[7] A "shaving" device is typically used only when the atheroma is calcified. Exhibit 212.

-10-

Case No. DH-B-06-800032

Mr. Tucker's pre-operative diagnoses included: a) thrombus in his left arm vascular graft; and b) end-stage renal disease. Ibid. Mr. Tucker was very sick as he also had insulin-dependent diabetes, and had had one or more CVAs in the past. Exhibits 225, 226, 227, 229, and 230.

29. After Mr. Hickman was taken to post-operative care it was determined that he had probably suffered a CVA. Exhibits 227 and 229. There was no indication of the CVA while Mr. Hickman was in the operating room and under sedation.

30. Dr. Nutting conducted a review of Respondent's provision of care to Mr. Hickman. Exhibit 109. Dr Nutting found that it was unlikely that the "surgical procedure caused the stroke." Exhibit 109 (page 2). Dr. Nutting also found that the Respondent reported in his Operative Report (exhibit 225) that he conducted an atherectomy, but the discussion portion of the notes do not bear out Respondent's conclusion. Dr. Nutting determined this based on his view that "[a]n atherectomy requires shaving of the atheromatous material with an atherectomy device and this was not used." Exhibit 109 (page 3). Based on these findings, Dr. Nutting concluded that Respondent's actions were a "minor deviation from the standard of care," with no harm to the patient. Exhibit 109 (page 3).

31. In his Operative Report, Respondent notes that an angiogram identified the presence of an "atheroma of the brachial artery. . . ." Exhibit 225 (page 2). Respondent goes on to note that the atheroma was "mascerated and removed. . . ." Ibid. Further, the surgical nurse noted in her Peri-Operative Report that Respondent conducted an "Atherectomy of the left Basilic Vein" and the "Left Brachial Artery." Exhibit 231.

32. It does not appear that Dr. Nutting was given a copy of the pre- and post-operative angiograms so that he could ascertain (by comparing them) whether Respondent had successfully

-11-

removed an atheroma from Mr. Hickman, or the surgical nurse's Peri-Operative Report. These materials would have taken the guess work out of Dr. Nutting's assignment. Further, it appears that Dr. Nutting did not understand that an atherectomy can be performed without using an atherectomy device that "shaves" the atheroma. There are other means of dilating an artery and removing the atheroma that are acceptable and within the governing standard of care. Exhibits 212-216.

33. Lillian Jones was a 65-year old patient of Respondent's when she underwent surgery on November 4, 2004. Exhibit 232. Ms. Jones's anesthesiologist was Dr. Modaressi. Exhibit 234. Ms. Jone's pre-operative diagnoses included: a) thrombus in her right arm vascular graft; b) diabetes; and c) atherosclerotic peripheral vasoular disease. Ibid. Ms. Jones was very sick as she had had a stroke one month prior to surgery (exhibit 233), mild congestive heart failure (exhibit 110) and end-stage renal disease. Exhibit 232.

34. After Ms. Jones was taken to post-operative care and had hemodialysis, it was determined that she had suffered a CVA (stroke). Exhibits 104 (page 1) and 110 (pages 1-2). There was no indication of the CVA while Ms. Jones was in the operating room and under sedation. Exhibit 110 (page 2).

35. Dr. Nutting conducted a review of Respondent's provision of care to Ms. Jones. Exhibit 110. Dr. Nutting found that "I do not feel that the surgery contributed to the patient's stroke in that she seemed to be at least alert following the surgical procedure." Exhibit 110 (page 2). Dr. Nutting also found that the Respondent reported in his Operative Report (exhibit 232) that he conducted an atherectomy, but the discussion portion of the notes does not bear out Respondent's conclusion. Dr. Nutting determined this based on his view that "[t]o do an atherectomy one has to utilize an atherectomy device that actually shaves or partially removes

the atheromatous material," as compared to the Fogarty catheter reported by Respondent. Exhibit 110 (page 2). Based on these findings, Dr. Nutting concluded that Respondent's actions were a "minor deviation from the standard of care," with no harm to the patient. Exhibit 110 (page 3).

36. In his Operative Report, Respondent notes that after performing a thrombectomy, an "arteriogram was obtained that revealed atheroma of the brachial artery. . . ." Exhibit 222 (page 2). Respondent goes on to note that a Fogarty catheter was inserted across the atheroma and was inflated to its fullest diameter. Then was mobilized to mascerate the atheroma. . . ." Ibid.

37. It does not appear that Dr. Nutting was given a copy of the pre- and post-operative arteriograms so that he could ascertain (by comparing them) whether Respondent had successfully removed an atheroma from Mr. Hickman. These materials would have taken the guess work out of Dr. Nutting's assignment. Further, it appears that Dr. Nutting did not understand that an atherectomy can be performed without using an atherectomy device that "shaves" the atheroma. There are other means of dilating an artery and removing the atheroma that are acceptable and within the governing standard of care. Exhibits 212-216. Of course, it is also clear that Respondent incorrectly recorded the atherectomy device actually used during the surgery (he listed a Fogarty catheter, which can neither be "inflated to its fullest diameter" (it is not a limited diameter catheter) nor can it mascerate an atheroma).

38. James Miller was a 59-year old patient of Respondent's when he underwent surgery on March 16, 2005. Exhibits 235 and 111. Mr. Miller's pre-operative diagnoses included: a) thrombus in his left arm vascular graft; b) stenosis of left subclavian vein; and c) end-stage renal disease. Exhibit 235. Mr. Miller was very sick as he was also HIV positive with a history

-13-

Case No. DH-B-06-800032

of IV drug abuse and hypertension. Exhibits 236 and 237. Prior to his surgery, Mr. Miller's "[r]ight subclavian vein [was] known to be stenotic by history." Exhibit 240.

39. Mr. Miller complained of significant chest pain after the operation was completed. Exhibits 235 (page 1) and 111 (page 2). After consultation with Dr. Cyrus Nemati, it was determined that Mr. Miller suffered a hemomediastinum (exhibits 236 and 238), a condition that occurs when blood leaks during surgery into the chest cavity. Hemomediastinum occurs in approximately 1-1% of surgical patients and can cause severe chest pains. The fact that Mr. Miller had a hemomediastinum is not an indication that Respondent deviated from the standard of care. Many doctors treating HIV positive patients prefer not to create hemodialysis access grafts in the patient's thigh as these grafts are more prone to infection, which is dangerous for people who are HIV positive.

40. Dr. Nutting conducted a review of Respondent's provision of care to Mr. Miller. Exhibit 111. Dr. Nutting found that "the angiogram revealed complete occlusion of the left innominate vein . . . [so that] angioplasty in this case should not have been done." Exhibit 111 (page 2). Based on this finding, Dr. Nutting concluded that Respondent's actions were a "significant deviation from the standard of care and a negative impact on the patient's care was possibly a result of this deviation." Exhibit 111 (page 2). Accordingly, Dr. Nutting opined that Respondent should have created a new access "for the patient in another extremity." Ibid (page 2).

41. In his Operative Note, Respondent reports that after taking more than one angiogram, it was determined that the left subclavian vein was "totally occluded" and the left innominate vein was "occluded as well." Exhibit 235. After inspecting the subclavian vein, Respondent determined that he could safely insert a "Glidewire" across "the stenotic segment of the left

-14-

subclavian vein. . . . Multiple areas were treated in a similar fashion to open the stenotic segment

of the subclaviar vein. A completion angiogram revealed resolution of the stenotic segment of

the subclavian vein." Exhibit 235.

42. It does not appear that Dr. Nutting was given a copy of the pre- and post-operative

angiograms so that he could ascertain (by comparing them) whether: a) Mr. Miller's subclavian

vein was totally occluded such that it was impossible to safely insert a Glidewire and clear the

blockage; and b) Mr. Miller's left innominate vein was "completely" occluded. These materials

would have taken a portion of the guess work out of Dr. Nutting's assignment. However, as the

angiograms only provide a two-dimensional view of the vein, without looking at the vein itself to

see if there was actually space to insert safely the Glidewire, Dr. Nutting could not determine if it

was unsafe for Respondent to proceed. Further, Dr. Nutting concluded that "the angiogram

revealed complete occlusion of the left innominate vein." Exhibit 111. There is nothing in the

Operative Note that indicates that the left innominate vein was "completely" occluded.

43. In February 1999, the Washington Hospital Center Appeal Body determined that

contrary to a finding of the Fair Hearing Board, there was insufficient evidence to establish that

Respondent had provided substandard care to his patients. Exhibit 210. The Appeal Body did

find that there was substantial evidence that Respondent's record keeping had "significant and

serious deficits." Ibid.[8]

---

[8] As a result of the determination by the Washington Hospital Center Appeal Body, the Board of
Medicine took reciprocal action concerning record keeping practices against Respondent. Respondent, in
turn, appealed to this administrative court, which ultimately dismissed the reciprocal action against
Respondent. See In re: Ahmed Ali, M.D., B-02-80114.

44. On August 18, 2005, after reviewing the reports from Dr. Nutting, the Peer Review

Committee at GSH reinstated Respondent's surgical privileges, except to conduct angioplasty,

which Respondent had voluntarily relinquished. Exhibit 209.

### III. Conclusions of Law

The Government has the burden of proving by the preponderance of the evidence that

Respondent has willfully made or filed a false record in his practice, willfully made a false

representation in treatment, failed to conform to standards of acceptable conduct and prevailing

practice, and demonstrated a willful or careless disregard for health, welfare or safety of his

patients and that his conduct either individually or collectively "presents an imminent danger to

the health and safety of the residents of the District of Columbia." D.C. Code, 2001 Ed. §§ 3-

1205.14(a)(8), (1), (26), (28) and 3-1205.15(a). There must be substantial evidence to support

the summary suspension of Respondent's license. Substantial evidence means more than a mere

scintilla of proof; it means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Children's Defense Fund v. District of Columbia department*

*of Employment Servs.*, 726 A.2d 1242 at 1247 (D.C. 1999). *See also Sherman v. Comm'n on*

*Licensure to Practice the Healing Art*, 407 A.2d 595, 600-601 (D.C. 1979) (holding that due

process does not require use of a higher standard of proof than preponderance of the evidence in

disciplinary proceedings against health professionals).

The Government did not present a single witness with first hand knowledge of the facts

underlying its case. Mr. Scurlock, the only witness to testify for the Government, is an able

investigator, but he got all of his information second and third hand. The reports submitted by

the Government were all hearsay and in some significant portions contained hearsay within

hearsay. The Government did not present either of the authors (Dr. Nedd and Dr. Nutting) as

Case No. DH-B-06-800032

witnesses. Further, the Government did not even offer as evidence the authors' curriculum vitae, so that we could ascertain what, if any, expertise they had in the very specialized areas of surgical practice that were at issue in this case. Hence there has been no showing that either doctor is qualified to make the findings each made or the associated conclusions. In assessing the reliability of hearsay such as this, the Court of Appeals has provided the following guidance:

> [a]mong the factors to consider in evaluating the reliability of hearsay evidence are whether the declarant is biased, whether the testimony is corroborated, whether the hearsay statement is contradicted by direct testimony, whether the declarant is available to testify and be cross-examined, and whether the hearsay statements are signed and sworn.

*Gropp v. District of Columbia Board of Dentistry*, 606 A.2d 1010, 1014 (quoting *Wisconsin Avenue Nursing Home v. District of Columbia Commission on Human Rights*, 527 A.2d 282 at 288 (D.C. 1997).

Furthermore, the Court of Appeals has:

> echo[ed] our previous warnings again today. Where, as here, the declarant is available to testify and be cross-examined, the practice of relying exclusively on hearsay is strongly discouraged and should be heavily weighted against the sponsoring party. In the ordinary administrative case, hearsay is generally disfavored because "in all adjudicative proceedings, 'cross-examination and confrontation are the handmaidens of trustworthiness in the face of factual dispute.'

*Compton v. D.C. Board of Psychology*, 858 A.2d 470, 479 (D.C. 2004), *(internal citations omitted)*.

Dr. Nedd did not testify; however, the Government did introduce his report of the review he did of Respondent's cases (exhibit 104). Dr. Nedd is a direct competitor of Respondent's, such that he has a bias against Respondent. Dr. Nedd's report is very terse. The points which are corroborated are of limited significant to this proceeding. However, Dr. Nedd's few specific findings that are significant to this proceeding are not corroborated. Additionally, his report contains important errors, e.g. a different

-17-

anesthesiologist attended each patient. Further, the sworn testimony of Respondent and Dr. Singal directly contradict the findings and conclusions in Dr. Nedd's report. The Government did not offer an explanation as to why Dr. Nedd did not testify and make himself available for cross-examine. Finally, Dr. Nedd's report is not signed and sworn.

Dr. Nutting does not know Respondent and has no obvious bias against him. Dr. Nutting did not testify; rather the Government introduced his reports of the review he did of Respondent's cases (exhibits 108-111). Dr. Nutting's reports are more detailed than Dr. Nedd's; however, he was not given the pre- and post-operative angiograms/arteriograms for each patient, so it was impossible for Dr. Nutting to safely draw some of the conclusions that he reached. While certain portions of his report are corroborated by other evidence, on the crucial issues before this administrative court, Dr. Nutting's findings are not corroborated. In fact, the sworn testimony of Respondent and Dr. Singal contradict significant portions of Dr. Nutting's findings and conclusions. The Government did not offer an explanation as to why Dr. Nutting did not testify and make himself available for cross-examine. Finally, Dr. Nutting's report is not signed and sworn.

Therefore, I conclude that Dr. Nedd's report is not substantial evidence in support of the Government's case. I also conclude that Dr. Nutting's reports, while of greater significance than Dr. Nedd's, do not rise to the level of proving by a preponderance of evidence the charges leveled against Respondent, or the individual specifications associated therewith.

I will review briefly the evidence (or lack thereof) for each charge separately.

Case No. DH-B-06-800032

**Charge I:     Willfully making a misrepresentation in treatment**

The specifications for this charge are Respondent have failed to properly document the operative procedures he performed on three patients (Wayne Tucker, James Hickman, and Lillian Jones). In other words, it is alleged that Respondent recorded in his Operative Reports that he conducted an atherectomy on these individuals, without having actually completed such a procedure.

The Operative Reports at issue clearly demonstrate that Respondent conducted an atherectomy on each of the patients. Exhibits 220, 225, and 232. Dr. Nutting's reports that draw the opposite conclusions are based solely on the fact that Respondent did not identify the atherectomy device that he used to perform the procedure. Dr. Nutting's reports fail to explain why he chose to discount or ignore the other information in Respondent's operative reports indicating that he completed an atherectomy, or in one instance the surgical nurse's report that an atherectomy had taken place. Exhibit 231. Dr. Nutting's reports also fail to explain how he could arrive at these conclusions without reviewing the pre- and post-operative films of each patient's artery, which, it appears, would have provided conclusive evidence to answer the question. Finally, neither Dr. Nutting nor any other evidence submitted by the Government establishes why the failure to identify the exact atherectomy device used by Respondent renders him an imminent danger to the health and safety of the residents of the District of Columbia.

-19-

Rx Date/Time    MAR-13-2007(TUE) 12:04               PAGE  21/30
   03/14/2007  12:46    7827537

Case No. DH-B-06-800032

**Charge II:**   Willfully making or filing a false report or record in the practice of a health profession

The specifications supporting this charge are that Respondent failed to document that three patients (Wayne Tucker, James Hickman, and Lillian Jones) suffered intra-operative cardio-vascular accidents ("CVA") during declotting procedures he preformed.

On this point, the Government offered no evidence, except Dr. Nedd's report, to support the charge. Dr. Nutting's reports and Respondent's Operative Reports establish that the patients in question were sedated (at least one overly so) during the declotting procedures, such that Respondent would not/could not have known that the patient's suffered a CVA during the surgery. Exhibits 220, 225, 232, 108, 109, and 110. Additionally, the testimony of Dr. Singal, who has no discernable interest in the outcome of this matter, is highly qualified to render her opinions and was a credible witness, was that the sedation utilized during these declotting procedures is too strong for a surgeon to know prior to writing their operative report, that the patient suffered a CVA. This problem, according to Dr. Singal, is why post-operative care progress notes/reports are utilized by hospitals to document these very circumstances. This is also the conclusion of Dr. McCreary (retired Chair of GSH Surgery Department), as evinced by his sworn affidavit (exhibit 206, paragraph 6) and Dr. Venbrux, professor of Radiology and Surgery at GW and Johns Hopkins School of Medicine, in his sworn affidavit (exhibit 205, paragraph 8). Further, Dr. Singal noted that patient's with the risk factors similar to these patients are at high risk of having a CVA during surgery. The fact that Respondent elected to serve high-risk patients, who have a greater chance of having a CVA than others during surgery, is not proof that he deviated from the standard of care and thereby caused the CVAs in question.

-20-

**Charge III:   Failing to conform to standards of acceptable conduct and prevailing practice with a health profession**

The specifications supporting this charge are: Respondent used sodium bicarbonate ($NaHCO_3$) as an additive to lidocaine (an local anesthetic) while performing declotting procedures on four patients (Wayne Tucker, James Hickman, Lillian Jones, and Robert Miller), performed an angioplasty of the left subclavian vein on Robert Miller after it was determined that the innominate vein was completely occluded, and that Respondent is a general surgeon, but not a vascular surgeon.

As it relates to Respondent's use of sodium bicarbonate as an additive to lidocaine, the Government relies solely on the report of Dr. Nedd. It appears by all accounts on this record that Dr. Nedd is mistaken. Exhibits 205, 206, 217, 218, and 219. Collectively, these exhibits establish that sodium bicarbonate has been used as an additive to lidocaine for years throughout the country, that it has been used in the District of Columbia to the point that it is a well-known approach, and that it is harmless to patients. It appears this whole issue raises more questions regarding a physician's approach to pain management than it does Respondent's failure to conform to acceptable conduct and prevailing practice.

As it relates to the question of continuing with the declotting of Mr. Miller's left subclavian vein after it was determined that his left innominate vein was completed occluded. It is unclear how and why Dr. Nutter concluded that Mr. Miller's innominate vein was completely occluded. Exhibit 111 (page 2). Respondent's Operative Notes only report that Mr. Miller's innominate vein was occluded, as compared to "completely" occluded. There is a significant difference medically between an occluded innominate vein and a completely occluded innominate vein. As Dr. Nutter has not explained how

-21-

Case No. DH-B-06-800032

and why he reached his conclusion and there is contradictory evidence showing that the innominate vein was not completely occluded, there is insufficient evidence to support the finding that it was wrong for Respondent to proceed with the declotting of Mr. Miller's subclavian vein.  It is worth noting that Dr. Nutting also never discusses the propriety of placing a graft in Mr. Miller's thigh, his recommended course of action (Mr. Miller's right subclavian vein was known to be occluded and unavailable for a graft), given the increased risk of infections with these grafts and the danger this presents to HIV positive patients.

Finally, it is perplexing that the Government relied exclusively on Dr. Nedd to conclude that Respondent was not a vascular surgeon.  All of the evidence points to the contrary, and it appears that just looking at the documents it had would have helped the Government realize the fallacy of this specification.  Exhibits 106, 200, 201, 202, 203, 205, 206, and 207.

Charge IV simply restates the charges and specifications of Charges I-III and characterizes these charges and specifications as presenting a willful or careless disregard for health, welfare and safety of Respondent's patients.  As I have found that the Government has not met its evidentiary burden in Charges I-III, there is no basis to conclude that Respondent's actions were willful or careless, as alleged.

Finally, it is worth noting that the Government's case was so lacking in evidentiary support as to make this court question why it chose to proceed against Respondent in this fashion.  In the absence of a serious presentation of evidence, this matter appears to confirm the truth of the old adage that: "no good deed goes unpunished."  Respondent was safely ensconced at GW Hospital.  He did not need to take on the added responsibility of patients at GSH.

-22-

Rx Date/Time    MAR-13-2007(TUE) 12:04    7827537    P. 024
03/14/2007   12:46   7827537    PAGE   24/30

Case No. DH-B-06-800032

However, by deciding to go to GSH, Respondent brought state of the art procedures to very sick, vulnerable, low-income patients who do not regularly have access to such procedures. These new procedures may have confused some doctors used to the old ways; they may have made some doctors jealous because patients liked the newer ways of Respondent, but these are not justification for the humiliation and expense Respondent was forced to endure while defending himself against these unsubstantiated charges.

## IV.   ORDER

Based on the above findings of fact and conclusions of law, it is this _____28th_____ day of February 2006:

**ORDERED** that the January 26, 2006, Notice of Summary Action to Suspend License issued to Respondent Ahmed Ali, M.D., is hereby **REVERSED and VACATED**; and it is further

**ORDERED** that pursuant to D.C. Code, 2001 Ed. §2-510 and 17 DCMR 4118.9(d), judicial review of this order may be obtained by filing a petition for review with the District of Columbia Court of Appeals. Pursuant to D.C. App.R. 15(a), any such petition must be filed within thirty (30) days of the service date of this order.

Jesse P. Goode
Administrative Law Judge

-23-